86  171
65a  19

SISTERS OF LORETTO, OF CHICAGO,

*v.*

THE CATHOLIC BISHOP OF CHICAGO.

1. EVIDENCE — *degree of evidence* — *whether deed procured by unfair means.* Clear and satisfactory evidence to show that a conveyance of property was obtained by the use of unfair means, or that undue influence was exercised in procuring its execution, ought to be made to warrant a decree canceling what was done, and the same degree of proof is required to show that the deed is a forgery, where it is regularly acknowledged.

2. SAME — *evidence to show a forgery.* The fact that the notary taking the acknowledgment of a deed is not certain that the party in whose name it is executed is the same person whose acknowledgment he took, and that he thinks the person who signed and acknowledged the same was a smaller person, is not sufficient to overcome the certificate of the officer made at the time, especially where the premises are abandoned and given to the grantee without objection, immediately after.

APPEAL from the Superior Court of Cook County; the Hon. E. S. WILLIAMS, Judge, presiding.

Mr. W. B. SCATES, for the appellant.

Messrs. CAULFIELD, PATTON & HONORE, for the appellee.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

This litigation concerns property the title to which had previously been in the Catholic bishop for the use of the people of a parish in Chicago. From 1863 to 1869 it was

occupied by a number of ladies belonging to an order known as " Sisters of Loretto," a society for religious consecration. During that time they were engaged in teaching, partly a free school and partly for a compensation paid by pupils receiving instruction. The income from that source was to defray ordinary expenses. In 1869 the persons engaged in that work became incorporated, under the laws of this State, by the name of " Sisters of Loretto, of Chicago." After Bishop Duggan became insane, the property was conveyed, or attempted to be conveyed, to the corporation by Father Halligan, who was then temporary administrator of the diocese. His authority to make any conveyance of real property held in trust for the use of the church is questioned, and it is very doubtful whether, according to the usages of the church, he possessed any power to alienate its real property. But that question need not be passed upon in making this decision.

While the corporation was in possession of the property, valuable improvements were made, furniture was purchased for use in it, assessments against the property paid, and perhaps some mortgage indebtedness assumed. On account of ill health of the lady superior, who was also president of the corporation, she became unable to manage its affairs, and there being no one in the corporation who, in the opinion of the bishop, was entirely competent or fit to be promoted to that position, he recommended the organization should be abandoned and the property reconveyed to the bishop in trust, according to the usage of the church. A deed was prepared, and on August 11, 1871, it was executed by the president and secretary of the corporation, and the corporation seal attached before a notary public, who certified the acknowledgment. That deed was delivered, and placed on record in the proper office. The consideration specified in the deed was nominal, and it does not appear anything was paid directly to any of the corporators, to induce its execution. Of course the property remained subject to the indebtedness placed upon it by the corpora-

tion, and it is in proof the bishop refunded to a postulant in the order a considerable sum of money she had advanced to the corporation, that he paid small bills that had been contracted by the corporation, and advanced small sums of money to several corporators, when they were about leaving to seek situations elsewhere. Within a few days after the making and delivery of the deed to the bishop for the property, all the corporators left the premises, a number of them going to other States. So far as shown by the record, all of them abandoned the corporation and the property, except Rosanna M'Sweenie, who was known in the order or community of which she was a member as Mother Ferdinand. About three years after the property had been surrendered she caused this bill to be filed to set aside and cancel the deed as a cloud upon the title, and thereafter prosecuted the suit with all the vigor her means would permit; but she died before the cause was heard in the court below. It does not appear any one of the corporators now claims to have any interest in the affairs of the corporation, or the property that had belonged to it.

Two reasons are assigned why this deed reconveying the property to the bishop should be canceled: first, it is not the voluntary act of the grantors; and, second, it was never in fact signed by the president of the corporation by whom it purports to have been executed.

On examination no satisfactory evidence is found of any undue influence exercised by the bishop, or any of those persons alleged to have been in conspiracy with him, over the corporators or any of them, to induce the making of the deed. The notary who certified the acknowledgment was examined, and testified he was alone in the room with Mother Ferdinand, president of the corporation, and Sister Jane Frances, secretary, when they signed and acknowledged the deed and affixed the seal of the corporation. His statement is, these ladies were much excited, and declared they were unwilling to make the conveyance. Accordingly, he says, he advised them he could not take their acknowledg-

ment to the deed unless it was their voluntary act. On attempting to leave the room, he says, they beckoned him to come back, saying they must execute the deed or the bishop would "send them to purgatory." Sister Jane Frances' testimony was not taken on this or any other branch of the case; but Mother Ferdinand does not say, in her testimony, the bishop ever made such threats to her, nor that she would have been influenced in the slightest degree in her conduct had any such threats been made. According to the testimony, while the members of that church may believe in the existence of "purgatory," they do not believe the bishop or any priest has power to consign persons to such punishment; and these corporators, being most zealous members, espousing the faith, must have been familiar with the tenets of the church on that subject. It is hardly probable the corporators could have been influenced in their action by any such consideration, and especially Mother Ferdinand, who, notwithstanding her great physical infirmities, seems to have been at the time a woman of extraordinary energy and will-power. But the bishop and all others accused deny they ever made any such threats or used any harsh means to influence the making of the deed, and we are not prepared to hold that their positive denial in that respect is overcome by anything in the record.

On the other branch of the case, the president of the corporation testified she never signed the deed reconveying the property to the bishop; that her name thereto is a forgery; and the notary is not certain she is the same person whose acknowledgment he took as having executed the deed. His impression is, the woman who signed and acknowledged it was a smaller woman. That is the principal evidence on this subject, and it is certainly not sufficient to overcome the certificate of the officer, made at the time. The acts of the parties interested are inconsistent with the theory of the case advanced, that the signature of the president of the corporation to the deed is a forgery. As we have seen, within a few days after the making of the

deed the corporators voluntarily left the premises, Mother Ferdinand among the others. Had she signed no deed, it is singular indeed she would have voluntarily left the property without making any inquiry why it was being abandoned. But that she did not do. It is conceded the deed was signed and acknowledged by the secretary of the corporation, Sister Jane Frances, and if it is true Mother Ferdinand was personated on that occasion by another woman, the fact could have been established by the testimony of Sister Jane Frances had it been taken. Her testimony would have been all important in settling this controverted fact in the case. She resided in Alabama, and her place of residence was known to Mother Ferdinand when her deposition was taken ; but no effort seems to have been made to secure her evidence — at least it was not taken. The fact that all the corporators abandoned the property, and that no one since, except Mother Ferdinand, has made any effort to recover it, is some evidence, though it may be slight, that they understood the property had been reconveyed by the proper officers of the corporation.

Both parties have indulged in complaint as to the conduct of the other. It may be this invalid woman was not treated with that kindness her great sufferings demanded, and especially in view of the fact she had consecrated her life to doing good in a religious order that inhibits all pecuniary gains to its individual members ; but, whether that is so or not, it has no bearing on the questions relating to the property. The evidence in the record as to both points made against the deed is contradictory in the extreme, and much of it totally irreconcilable. That clear and satisfactory evidence is wanting, to show the reconveyance of the property to the bishop was obtained by the use of unfair means, or that any undue influence was exercised by any one over any of the corporators, or that the president's signature to the deed was a forgery, that ought to be made to warrant a decree canceling what was done.

The decree will be affirmed.

*Decree affirmed.*